### HILL *v.* RALPH.

### Opinion delivered October 13, 1924.

1. STATUTES—CONSTRUCTION.—A statute must be viewed as a whole, and every word and every part considered and compared and given some sensible meaning if possible, in order to arrive at the intent of the Legislature in the enactment.

2. SCHOOLS AND SCHOOL DISTRICTS—LOCATION OF HIGH SCHOOL—CENTER OF DISTRICT.—In requiring that a high-school building to be erected by a school district should be "geographically located in the center of the district so as to best serve the greatest number of children of scholastic age in the district," the legislative purpose was to require the location to be as near the geographical center of the district as possible, taking into consideration all of the factors that would best serve the greatest number of children of scholastic age in the district.

3. ARBITRATION AND AWARD—CONCLUSIVENESS OF AWARD.—Where an act providing for the location of a high school building provided that, if the directors of the school district disagreed as to its location, the matter should be submitted to a board of arbitration, whose decision fixing the location of said school building should be conclusive, the decision of such board is conclusive, in the absence of actual fraud or such gross mistake as to be tantamount thereto.

Appeal from Mississippi Chancery Court, Osceola District; *J. M. Futrell,* Chancellor; affirmed.

*J. T. Coston,* for appellant.

The act is mandatory. An act must be so construed as to give every section a meaning, so as not to render such section nugatory. 109 Ark. 60. A material depar-

ARK.] HILL *v.* RALPH. 525

ture from the plan laid down by the Legislature renders
such action void. 113 Ark. 491. See also 102 Calif. 642,
36 Pac. 949; 288 Ill. 240; 13 Okla. 285. The site selected
was not the one to "best serve the greatest number of
children."

*Chas. E. Sullenger,* for appellee.

In order to set aside an award of a board of arbi-
tration it must be shown that the award was fraudulently
made or that the arbitrators made a mistake in making
their award. Fraud is never presumed, but must be
specifically charged. 106 Ark. 156; Pomeroy's Equity
Juris. 2, 871, 1797. The presumption is in favor of the
validity of the award, and its invalidity must be clearly
shown. 5 C. J. 289, p. 123; 5 C. J. 389, p. 160. See also
5 C. J. 463, p. 180. Where the Legislature has erected
a tribunal for a specified purpose, its decision is final,
and cannot be reviewed by the courts. 96 Ark. 424.

WOOD, J. The Shawnee Special School District No.
10 was created by act 143 of the Acts of 1923. Section
15 of that act provides for the support and maintenance
of schools at the places where they were formerly taught
throughout the territory which was brought into the Shaw-
nee Special School District No. 10 "until such time as
a suitable building may be erected, centrally located in
said district, with ample facilities for the proper care of
all the children of scholastic ages in said district, then,
at any annual school meeting held thereafter, the said
qualified electors of said Shawnee Special School Dis-
trict No. 10 may, by a majority vote, abolish said schools,
or any of them, provided, however, that the board of
directors shall, at all times, have the right to provide
for and maintain schools in any part of the district
when, in their discretion, the public welfare of the chil-
dren of the district demands same."

Section 18 of the act provides as follows: "The
location of all buildings for school purposes in said dis-
trict shall be left to the discretion of the board of direc-
tors, provided, however, that any high-school building
erected in the district shall be geographically located in

the center of the district so as to best serve the greatest number of the children of scholastic age in the district, taking into consideration the accessibility of said building, roads, means of transportation, and all other factors to be considered; but, in the event said directors cannot unanimously agree upon a suitable location for a high-school building, they shall report such disagreement to the State Superintendent of Public Instruction of the State of Arkansas, and request that he appoint a board of arbitration, to consist of not less than three persons connected with the public schools of the State of Arkansas, and residing without the boundaries of Mississippi County, and, upon the appointment of such board of arbitration and their acceptance of such appointment, the State Superintendent of Public Instruction shall immediately notify the board of directors of said Shawnee Special School District No. 10, and fix the time and place when said arbitrators shall meet the said board of directors and arbitrate the differences of said board and announce their findings; the decision of said board of arbitrators fixing the location of said school building shall be conclusive and final. The expense of such board of arbitration shall be paid by the district, provided, however, that such expense shall not exceed the sum of $250."

The directors of Shawnee Special School District No. 10, hereafter called district, could not unanimously agree upon a suitable location for the high-school building, and a board of arbitration was appointed under the authority of the act. They met with the board of directors of the district, according to the provisions of the act, and heard the differences of the directors, and viewed the locations about which the members differed, and rendered their unanimous decision in writing, fixing the location of the high-school building and describing the same. The directors of the district acquired the land and issued bonds in the sum of $75,000, under the authority of § 7 of the act, and were preparing to erect a building on the site selected, when this action was instituted by the appel-

lants, forty-eight patrons and taxpayers in the district, against the directors, to enjoin the erection of the building. They alleged, among other things, that the site selected by the board of arbitration was not the geographical center of the district; that it was a distance of only 3½ miles from the south end of the district, a distance of only four miles from the southeast corner, four miles from the southwest corner, seven miles from the north end, eight miles from the northeast corner, and about 12 miles from the northwest corner of the district. They further alleged that the building was intended for white children only; that the white children of scholastic age were all living north of the site selected, except twenty-five, who were scattered through the south end of the district, and that no children lived within one mile of the building site. It was alleged that the geographic center of the district was high and dry, having an elevation of twelve or fifteen feet above the site selected by the board of arbitration, with roads radiating in all directions therefrom, making it convenient for all schoolchildren within the district; but that the site selected by the board of arbitration was low, wet, and swampy, and a fit breeding place for mosquitoes, malaria and chills, and that a school maintained there would endanger the health and even the lives of the children.

The appellees, the directors of the district, answered, denying, among other things, that the site selected was not authorized under the act and that the place designated by appellants in their complaint as the geographic center of the district was a more suitable location than the one selected by the board of arbitration, and denying that the place selected was low, wet, and swampy, and a fit breeding place for mosquitoes, malaria and chills, and that a school maintained there would endanger the health and even the lives of the children.

The testimony tended to prove that the directors of the district had differed over two proposed locations for the high-school building, one on the Dickenson place, which was described by the witnesses for the appellants

as about the geographic center of the district, considering the shape of the district and the accessibility of the site. They state that it was high and dry and well drained into a running stream; that the location selected by the board of arbitration, on the contrary, was much lower than the Dickenson lot, and was surrounded by lagoons and swamps that could not be drained; that, because of this fact, it was very unsanitary, and would be a breeding place for mosquitoes, and subject the children to malaria, typhoid, dysentery, and other miasmatic diseases. Such was the effect of the testimony of several witnesses for the appellants, including four physicians, who resided and practiced medicine in that community. One of these, after describing the two proposed locations, stated that the location on the Dickenson place would be much more convenient to all concerned—the most central. "The Dickenson place would make it about equal all the way through to all parties. It would give these people where the majority is, the same interest as where there are a few. The white children live in the north end, closer to the Dickenson place, and the south end of the district is a negro settlement."

On the other hand, the president of the board of directors of the district testified to the effect that he and two other members of the board wanted to locate the building where the site was selected by the board of arbitration, while two of them wished to locate it on the Dickenson place. As they could not agree, they asked that the Superintendent of Public Instruction appoint a board of arbitration, which was done, and the members of such board viewed the proposed sites and heard the statement of each of the directors, explaining the advantages and disadvantages of the respective sites, and the board of arbitration selected a site upon which the directors proposed to erect a building, located on the scenic highway and accessible to all parts of the district; that most of the white children of the district lived not over two and a-half miles from the site selected; that the location is a high, dry, sandy ridge, with splendid drainage, the best

in the county. The directors realized the fact that the building had to be located as near the center of the district as was practical, and they did not think it practical to put the building off of the highway, which ran parallel to the Frisco Railroad. They intended to drain the territory around the location selected before building, and the canal and road with the sewer drainage would drain it.

Two other witnesses testified substantially to the same effect, and one of them stated he was familiar with the location on the Dickenson place, and that water stood on it, and it was entirely too low; it was buckshot land, and not good for the children to play on—low and wet.

After hearing the testimony, the court found generally in favor of the appellees, and entered a decree dismissing the complaint for want of equity, from which is this appeal.

1. The decision turns on the meaning to be given the word "centrally," in § 15 of the act, and the word "center," in § 18 of the act. It is a well-recognized canon of statutory construction that some meaning should be given to every word contained in the statute, if possible. The statute must be viewed as a whole, and every word and every part considered and compared and given some sensible meaning, if possible, in order to arrive at the intent of the Legislature in the enactment. *State* v. *Boney,* 156 Ark. 169; *Carville* v. *Road Imp. Dist. No. 2,* 152 Ark. 487; *Nixon* v. *Allen,* 150 Ark. 244; *State* v. *Embrey,* 135 Ark. 262; *Cypress Creek Drainage Dist.* v. *Wolf,* 109 Ark. 60.

The primary meaning of the word "center" is, according to Funk & Wagnall and Webster, "the point or place equally distant from the extremities or from the different sides of anything. The middle, as the center of a town—the center of a throng," etc. "Central" means "relating to the center; situated in or near the center or middle." These words, "centrally" and "center," as used in the statute, must be construed with reference to the context. Observing these rules of construction, we

are convinced that it was not the purpose of the Legislature to require the high-school building to be located in the exact center of the district, for the district was neither in the form of a circle, square, or parallelogram, but was of odd shape—it had no mathematical center, and a geographical center could not be accurately ascertained. The evident purpose of the Legislature, as shown by the language with which the words "centrally" and "center" are associated and which qualified and limited their meaning, was to provide a location for a high-school building for the proper care of all children of scholastic age in the district—a location that would best serve the greatest number of children of scholastic age in the district, taking into consideration the accessibility of said building, roads, means of transportation, and all other factors to be considered. The language of § 18 clearly indicates that the Legislature contemplated that the directors, in considering the various factors entering into the selection of a suitable site for the building, might not agree, and, unless they did agree unanimously, a board of arbitration should be appointed to arbitrate the differences between the directors and fix the location for the school building.

Taking the language of the act as a whole, we conclude that it was the purpose of the Legislature to give the directors, in the first place, and the board of arbitration, in the second place, the power to locate the school building somewhere as near the center of the district geographically as could be ascertained, taking into consideration all of the factors that would make it an eligible site for a high school that would best serve the greatest number of children of scholastic age in the district. It was not the purpose of the Legislature to require the location of the building on the exact geographical center, if that could be ascertained. But the act does require that the geographic center be taken into consideration, and that the location of the building be placed thereon, or as near thereto as possible, all of the factors of eligibility mentioned in the statute being considered. Therefore

we conclude that it was within the power or jurisdiction of the board of arbitration to fix the location for the school building at the site designated by it.

2. The act, in express terms, makes "the decision of the board of arbitration fixing the location of said school building conclusive and final." There is no attack made upon the regularity of the proceedings of the board of arbitration, nor is there any allegation that there was fraud upon the part of the arbitrators. The allegation of appellants that the location selected by the board of arbitration "is low, wet, swampy, and a fit breeding place for mosquitoes, malaria and chills, and to place the school building there would jeopardize the health and even the lives of the children," is denied by the appellees. If the above allegation had been admitted or proved conclusively, it might be said that the decision of the board of arbitration was a gross mistake, and so arbitrary and unreasonable as to amount to a fraud on the inhabitants of the district and the patrons of the proposed high school. But the chancery court, after hearing the testimony, did not reach this conclusion, nor did the testimony justify such conclusion. The Legislature erected this special tribunal to determine the location for the high-school building in Shawnee Special School District No. 10, and, in the absence of actual fraud, or such gross mistake as to be tantamount thereto in law, its decision cannot be overturned. 2 Pomeroy's Jurisprudence, § 879; 5 C. J. §§ 289, 389, 463. See also *Shibley v. Fort Smith & Van Buren Bridge Dist.*, 96 Ark. 424.

The decree is in all things correct, and it is therefore affirmed.